**COUNTRY CLUB DISTRICT
HOMES ASSOCIATION,
et al., Respondent,**

**National Trust For Historic Preser-
vation and Historic Kansas City
Foundation, Amicus Curiae,**

**Homes Associations of the Country
Club District, Amicus Curiae,**

v.

**COUNTRY CLUB CHRISTIAN
CHURCH, Appellant.**

**No. WD 61418.**

Missouri Court of Appeals,
Western District.

Sept. 2, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 28, 2003.

Neil Shortlidge, Overland Park, KS, Curtis Woods, co-counsel, Kansas City, for appellant.

Sam Colville, Overland Park, KS, for respondent.

Michael M. Burke, Daniel R. Cofran, Kansas City, for amicus curiae.

Before ELLIS, C.J.,
BRECKENRIDGE and HOLLIGER, JJ.

PATRICIA BRECKENRIDGE, Judge.

Country Club Christian Church appeals from the trial court's judgment in favor of Country Club District Homes Association and several residents of Hampstead Gardens,[1] a subdivision within the County Club District, (collectively "the Association"). The trial court ruled in favor of the Association on its petition to enjoin the Country Club Christian Church ("the Church") from building parking lots on its property in violation of a covenant restricting use of the property to "private residence purposes." The Church raises two points on appeal. First, the Church claims that the trial court erred in enjoining it from constructing parking lots because the restrictive covenant encumbering its property does not bar construction of church parking lots under the ruling in *Fitzwilliam v. Wesley United Methodist Church*, 882 S.W.2d 343 (Mo.App.1994). Second, the Church argues that the trial court erred in enjoining it from building parking lots because changed circumstances preclude the enforcement of the restrictive covenant. This court finds that building church parking lots would violate the restrictive covenant and the Church has not proven that the changed conditions warrant not enforcing the restrictive covenant.

Accordingly, the judgment of the trial court is affirmed.

**Factual and Procedural Background**

The Church owns and occupies several lots within the Hampstead Gardens subdivision, a portion of the Country Club District, in Kansas City. The Association is a not-for-profit Missouri corporation that oversees the Country Club District.

In 1999, the Church proposed to construct parking lots on three of the lots it owns within the Hampstead Gardens subdivision: Lot 11, Block 6; Lot 8, Block 10; and Lot 9, Block 10. In response to the Church's proposal, the Association filed a petition to permanently enjoin the Church from building parking lots on its property. The Association claimed in its petition that the building of parking lots would violate the restrictive covenant covering Hampstead Gardens, which includes the provision that "[n]one of said lots shall be improved, used nor occupied for other than private residence purposes[.]"[2] This covenant restricted all but the west fifty feet of Lot 9, Block 10, which had been freed to be used for Church purposes, and the east fifteen feet of the west sixty-five feet of Lot 9, Block 10, which, in 1951, had been freed for the purpose of building a driveway for the church building, but was expressly prohibited from being used for parking. The Association subsequently filed a motion for "partial summary judgment," asserting that the construction of

---

1. The individual residents of Hampstead Gardens who joined as plaintiffs are Beatrice Davis, George and Laurie McLiney, James and Anne Cooling, Hugh and Debra MacLennan, Kevin and Pamela McLiney, and Steven and Emma Theis.

2. There are actually three restrictive covenants, each pertaining to one of the three lots upon which the Church proposes to construct the parking lots. All three covenants contain the identical language that "[n]one of said lots shall be improved, used nor occupied for other than private residence purposes[.]" For simplicity, the three restrictive covenants are referred to in the singular.

the parking lots would violate the restrictive covenant.

The Church then filed a cross-motion for summary judgment. In its motion, it admitted that the lots on which it proposed to build parking lots are encumbered by the "private residence purposes" restriction. It claimed, however, that under Missouri law, church uses, including accessory uses like a parking lot, are authorized and expected in residential districts. Alternatively, the Church asserted that the restrictive covenant should not be enforced against it because of changed conditions. Both of the parties stipulated that they presented all of the evidence they would present at trial and requested that the trial court determine the case on the merits.

On April 12, 2002, the trial court granted judgment in favor of the Association. The trial court found that the language of the restrictive covenant encumbering the property was unambiguous and requires "that none of the lots can be improved, used or occupied for other than private residence purposes, to the exclusion of all other uses." The court also found that the Church's evidence of changed conditions was insufficient because it offered "no substantial evidence of any changes in the character of Hampstead Gardens or the Country Club District such as would have diminished the value these restrictions have upon other property within the subdivision." Instead, the Church's evidence "principally pertains to changes in the church going habits and practices of church members and the resulting changes in the needs of churches, generally." Therefore, the trial court held that the construction of parking lots would violate the restrictive covenant and permanently

enjoined the Church from building parking lots on its property encumbered by the restrictive covenant. This appeal follows.[3]

## Standard of Review

■ Although the parties titled their cross-motions as "motions for summary judgment," they both stipulated that they presented all of the evidence they would present at trial and requested that the trial court determine the case on the merits. As such, this court's review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *McBee v. Gustaaf Vandecnocke Revocable Trust*, 986 S.W.2d 170, 173 (Mo. banc 1999). The judgment of the trial court will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32.

In its brief on appeal, the Church claims that because the trial court ruled the case strictly upon the record, this court "may review the facts and the law anew without deference to the Circuit Court's findings below." In support of this position, the Church cites *Bauer v. Bauer*, 97 S.W.3d 515, 519 (Mo.App.2002). Contrary to this argument, however, *Bauer* does not provide that when a trial court rules a case strictly upon the record, this court may review its findings of fact and conclusions of law *de novo*. Instead, *Bauer* states, "[w]hile an appellate court normally defers to the trial court's credibility determinations, ... such is not the case here where the trial court did not hear the evidence or observe the witnesses but ruled the case strictly upon the transcript, which is now before this court." *Id.* (internal citations omitted). *Bauer* deals only with the standard of appellate review for credibility de-

---

**3.** This court granted leave to the National Trust for Historic Preservation and Historic Kansas City Foundation and the Homes Association for the Country Club District to file amicus curiae briefs, which support the arguments of the Association.

terminations. Here, the Church is not arguing that the trial court made incorrect credibility determinations, but instead it is claiming that the trial court misapplied the law in interpreting the restrictive covenant and its finding regarding the changed circumstances is against the weight of the evidence. Thus, *Bauer* has no application to this case.

## Construction of Parking Lots Would Violate Restrictive Covenant

In its first point, the Church argues that the trial court erred in enjoining it from constructing parking lots on its property encumbered by the restrictive covenant. Specifically, it claims that under *Fitzwilliam v. Wesley United Methodist Church*, 882 S.W.2d 343 (Mo.App.1994), the restriction providing that "[n]one of said lots may be improved, used nor occupied for other than private residence purposes" does not prohibit it from building church parking lots.

 To determine whether the construction of parking lots would violate the covenant restricting use of the property to "private residence purposes," this court must interpret the restrictive covenant. In doing so, this court exercises *de novo* review. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App.2000). Restrictive covenants are " 'regarded unfavorably' " and are " 'strictly construed' " because " '[t]he law favors the free and untrammeled use of real property.' " *Hall v. Koehler*, 347 Mo. 658, 148 S.W.2d 489, 494 (1941) (quoting *Mathews Real Estate Co. v. Nat'l Printing & Engraving Co.*, 330 Mo. 190, 48 S.W.2d 911, 913 (1932)). Nevertheless, restrictive covenants are also regarded as "private contractual obligation[s]" and are " 'generally governed by the same rules of construction applicable to any covenant or contract.' " *Wildflower Cmty. Ass'n*, 25

S.W.3d at 534 (quoting *Kling v. Taylor–Morley, Inc.*, 929 S.W.2d 816, 819 (Mo. App.1996)). Thus, restrictive covenants, like any other covenant or contractual provisions, will be enforced where "the intention is clear." *See Hall*, 148 S.W.2d at 494.

 This court determines the intention of the parties "from the language used, and in the light of the entire context of the instrument containing the restrictions." *Andrews v. Metro. Bldg. Co.*, 349 Mo. 927, 163 S.W.2d 1024, 1028 (1942). "The intent must be gathered, not from one clause but from the four corners of the instrument." *Id.* "Where the language of a restriction as to the use of property is clear and unambiguous, its meaning must be given effect, and it is neither necessary nor proper to inquire into the surrounding circumstances for aid in its construction." *Hickey v. Greengard*, 176 S.W.2d 661, 663 (Mo.App.1944).

Missouri courts, on several occasions, have interpreted a residential restriction similar to the one at issue in this case. In *Barnes v. Anchor Temple Association*, 369 S.W.2d 893, 898 (Mo.App.1963), the Eastern District of this court decided whether a restrictive covenant prevented the building of a parking lot for Anchor Temple Association. The restrictive covenant stated that "[n]o building other than a private dwelling house, and the stable and outbuildings appurtenant thereto, shall be erected on any said lots, nor shall any lot or part thereof be used or occupied for any but private residence purposes." *Id.* at 895. In rendering its decision, the court noted that in construing restrictive covenants, "[t]he prime rule of construction is that when there is no ambiguity in the language used, then there is no room for construction." *Id.* at 898 (quoting *Porter v. Johnson*, 232 Mo.App. 1150, 115 S.W.2d 529, 533 (1938)). Instead, " '[t]he plain every day meaning of the language of the

contract governs.'" *Id.* (quoting *Porter,* 115 S.W.2d at 533). Applying those principles, the court held:

> We can see no ambiguity in the quoted words of the restriction as would admit to any construction other than to give effect to their plain meaning, that is, that the use or occupancy of the lots in question be *only* for residential purposes, and this would be clearly to the exclusion of all other purposes.

*Id.* Thus, the court found that the "private residence purposes" use restriction prohibited Anchor Temple Association from building a parking lot on its property. *Id.*

Five years after *Barnes,* the Missouri Supreme Court determined whether a restrictive covenant limiting the use of a right of access to "ordinary farm or residential purposes" precluded the use of that right of access in connection with an apartment building. *Shepherd v. State ex rel. State Highway Comm'n,* 427 S.W.2d 382, 383 (Mo.1968). The Court stated that, to make its decision, it must define the phrase "residential purposes." *Id.* at 386. The Court then set out some general rules of construction of a restrictive covenant, including: " ' "the intention of the restrictor as shown by the written instrument governs" ' "; restrictions should be strictly construed; restrictions will not be extended by implication; and any doubt about the restrictions' meaning should be " ' "resolved in favor of the free use of property." ' " *Id.* at 386–87 (citations omitted). Next, the Court looked to cases from other jurisdictions that had interpreted the phrase "residential purposes." *Id.* at 387–89. The Court found that most jurisdictions had concluded that "residential purposes" as used in a restrictive covenant did not prohibit apartment buildings or multi-family residences. *Id.* (discussing *Jernigan v. Capps,* 187 Va. 73, 45 S.E.2d 886 (1947); *McMurtry v. Phillips Inv. Co.,*

103 Ky. 308, 45 S.W. 96 (1898); *Sporn v. Overholt,* 175 Kan. 197, 262 P.2d 828 (1953); *Charlotte Consol. Constr. Co. v. Cobb,* 195 N.C. 690, 143 S.E. 522 (1928); *Tillotson v. Gregory,* 151 Mich. 128, 114 N.W. 1025 (1908); *Baker v. Smith,* 242 Iowa 606, 47 N.W.2d 810 (Iowa 1951)). The Court also quoted the following definition of a building that is used for "residential purposes": " 'one in which people reside or dwell, or in which they make their homes, as distinguished from one which is used for commercial or business purposes.' " *Id.* at 388 (quoting *Jernigan,* 45 S.E.2d at 889). Applying these principles to the restrictive covenant before it, the Court held the use of the phrase "residential purposes" "is not ambiguous and its ordinary and usual meaning as determined by the majority of courts is that the phrase 'residential purposes' includes the use of the land for apartment buildings[.]" *Id.* at 390.

In *Blevins v. Barry–Lawrence County Ass'n for Retarded Citizens,* 707 S.W.2d 407, 407 (Mo. banc 1986), the Supreme Court again dealt with a restrictive covenant providing that "[t]he aforesaid real property shall be used for residential purposes only[.]" The issue in *Blevins* was whether a "group home for eight unrelated persons and two house parents violate[d] the restriction against any use other than for 'residential purposes only.' " *Id.* at 408. The Court first declared that "when interpreting [restrictive] covenants, courts should give effect to the intent of the parties as expressed in the plain language of the covenant[.]" *Id.* The Court noted that it had previously interpreted the phrase "residential purposes" as used in a restrictive covenant in *Shepherd. Id.* The Court then restated the definition from *Shepherd* of a building used for "residential purposes," i.e., " 'one in which people reside or dwell, or which they make their homes, as distinguished from one which is

used for commercial or business purposes.'" *Id.* (quoting *Shepherd*, 427 S.W.2d at 388). Applying that definition and the general rules of construction, the Court in *Blevins* found that because the group home was owned and run by a non-profit organization, it was not a commercial enterprise, and its purpose was to "serve[ ] as a surrogate family arrangement," its use met the definition of "residential purposes," and, thus, was not prohibited by the restrictive covenant. *Id.* at 408–09.

This court utilized the Supreme Court's definition of "residential purposes," as used in a restrictive covenant, in *Fox v. Smidt*, 869 S.W.2d 904, 906 (Mo.App.1994). In *Fox*, this court determined whether a restrictive covenant providing that "[a]ll Lots hereinabove described shall be known and described as residential Lots, and no structures shall be erected, altered or placed or permitted to remain on any said Lots other than one detached single family dwelling[ ]" prevented property owners from erecting a building that looked like a residence but was to be used to store carpets for their business. *Id.* at 905. In reaching its decision, the court first noted that "[t]o interpret the meaning of the restrictive covenants in the agreement, we look at the plain and obvious purpose of the restriction and give the terms their ordinary and usual meaning in the connection in which they are used." *Id.* The court first determined that the restrictive covenant did not apply to the appearance of the structure, but instead to its use. *Id.* Thus, the court noted "[t]he issue in this case is whether the restrictive covenant precludes a commercial use of the property," an issue which the court held was controlled by *Shepherd* and its definition of "residential purposes." *Id.* Citing *Shepherd*, the court found that the phrases "residential lots" and "single-family dwelling:"

[C]ontemplate a building with a family residing in it and not one used for commercial purposes even though it has an exterior appearance of a residence. A 'residential lot' is one designed for a structure in which people reside or dwell or on which they make their homes, as distinguished from one which is used for commercial or business purposes.

*Id.* at 906. Thus, this court held that the defendants' proposed use of the building as a storage unit for a commercial enterprise violated the restrictive covenant despite the building's outward appearance. *Id.*

In *Mackey v. Griggs*, 61 S.W.3d 312, 316 (Mo.App.2001), the Southern District decided whether a covenant restricting property "to residential uses only and no commercial establishments" prevented a restaurant from building a parking lot. The court first set out some general rules governing the construction of restrictive covenants. *Id.* at 315. The court noted that "[i]t is well established that our courts interpret restrictive covenants so as to give effect to the intent expressed by the plain language of the covenant." *Id.* The court also stated that " 'the parties' intent is expressed by the natural and ordinary meaning of the words used in the contract.' " *Id.* (quoting *Dwyer v. Unit Power, Inc.*, 965 S.W.2d 301, 307 (Mo.App.1998)). The court pointed out that "[i]f the restrictive covenant is unambiguous, then it is not open to judicial construction." *Id.* The court then set out several Missouri cases examining restrictive covenants similar to the one before it, including *Blevins*. *Id.* at 316–17. Based on "a close examination and comparison of the covenant at issue and similar covenants," the court concluded that the covenant before it was not limited to restricting structures but also restricted the use of the land to residential uses and prohibited commercial uses. *Id.* at 317. Thus,

the court held that because "the parking lot is for a commercial use as an adjunct to the restaurant/bar on the adjoining lot" and "[t]here is no contention that there is any residential purpose or use to the parking lot," the restrictive covenant precluded the restaurant from building a parking lot. *Id.*

Under these cases, it would appear that based on the plain and ordinary meaning of the restrictive covenant at issue, here, the Church could not build parking lots on its property encumbered by the "private residence purposes" restriction. The only case supporting a contrary ruling, as the Church correctly points out, is *Fitzwilliam.* In *Fitzwilliam,* this court held that a restrictive covenant, which provided that "[n]o lot shall be used except for residential purposes," did not prevent a church from building a parking lot. *Fitzwilliam,* 882 S.W.2d at 344–45. In making this determination, the court first noted that "[r]estrictive covenants are not favorites of the law, and any doubt is resolved in favor of the free use of land." *Id.* at 344. The court also stated that "[i]n interpreting the meaning of a restrictive covenant, the court must look at the plain and obvious purposes of the restriction and give all terms their ordinary and usual meaning in the connection in which they are used." *Id.* The court recognized the Missouri Supreme Court's holdings in *Shepherd* and *Blevins* that a structure used for "residential purposes" means " 'one in which people reside or dwell, or in which they make their homes *as distinguished from one* which *is used for commercial or business purposes.*' " *Id.* (quoting *Shepherd,* 427 S.W.2d at 388). The court went on the decide that "[t]he drafter's intent in using the phrase 'residential purposes' [in the restrictive covenant] was clearly to preserve the overall residential character of the subdivision by prohibiting commercial activities and structures." *Id.* at 345.

Thus, the court held that because "[a] church is certainly not a commercial or business enterprise," the construction of the church parking lot would not violate the residential use restriction. *Id.* In reaching this holding, the court also considered the facts that the drafters were aware that city zoning ordinances permitted church parking lots in residential areas, the church building and a parking lot immediately next to the subdivision existed at the time the covenants were drafted, and "[t]he extension of the church parking lot into the subdivision was not unforeseeable" when the covenants were drafted, "yet the drafters did not specifically prohibit the construction of a parking lot." *Id.*

A close examination of *Fitzwilliam* reveals that its analysis appears to be contrary to that used in the Supreme Court cases and the prior appellate court cases. First, in setting out the Supreme Court's definition of a structure used for "residential purposes," the court in *Fitzwilliam* emphasized only the second half of the definition, i.e., one not used for commercial or business purposes, and did not give meaning to the first half, i.e., "one in which people reside or dwell, or in which they make their homes." *Id.* at 344. In both of its cases, however, the Supreme Court applied the entire definition of a building used for "residential purposes" and placed equal emphasis on both parts of the definition. *Shepherd,* 427 S.W.2d at 388–90; *Blevins,* 707 S.W.2d at 408. *See also Fox,* 869 S.W.2d at 906. Moreover, the Supreme Court gave no indication in either *Shepherd* or *Blevins* that the "commercial or business purposes" part of the "residential purposes" definition could be used to the exclusion of the "reside or dwell" portion.

Second, in *Shepherd* and *Blevins,* the Supreme Court determined that the

phrase "residential purposes" as used in restrictive covenants is unambiguous, and, thus, can be defined without looking at parole evidence. *Shepherd,* 427 S.W.2d at 390; *Blevins,* 707 S.W.2d at 409. *See also Mackey,* 61 S.W.3d at 317; *Fox,* 869 S.W.2d at 906; *Barnes,* 369 S.W.2d at 898. In *Fitzwilliam,* however, the court relied on parole evidence of the drafter's intent and the circumstances that existed at the time of the drafting to determine the meaning of the phrase "residential purposes" as used in the restrictive covenant. *Fitzwilliam,* 882 S.W.2d at 345. In doing so, the court indicates that the phrase "residential purposes" is ambiguous, such that parole evidence is needed to understand its meaning, which is contrary to the Supreme Court holding that the term "residential purposes" is unambiguous. Thus, the ruling in *Fitzwilliam* appears to be in conflict with the cases from the Supreme Court, and "[t]his court is constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court." *Kinder v. Mo. Dept. of Corrections,* 43 S.W.3d 369, 374 (Mo.App.2001).

■ This court does not need to rule on the viability of *Fitzwilliam,* however, because the language of the restrictive covenant at issue, here, is distinguishable from the language of the restrictive covenant in *Fitzwilliam.* In *Fitzwilliam,* the covenant restricted the use of the property to "residential purposes." *Id.* at 344. In contrast, the covenant in this case restricts the property to *"private* residence purposes." (Emphasis added.) Whereas a building used for "residential purposes" means " 'one in which people reside or dwell, or in which they make their homes, as distinguished from one which is used for commercial or business purposes,' " *Shepherd,* 427 S.W.2d at 388 (quoting *Jernigan,* 45 S.E.2d at 889), a building used for "private residence purposes" has been in-

terpreted to be more restrictive. In *Matthews v. First Christian Church of St. Louis,* 355 Mo. 627, 197 S.W.2d 617, 620 (1946), the Supreme Court held that a restrictive covenant limiting a building's use to only a "private residence" precluded the use of the building as a church. Despite its age, *Matthews* appears to be the most recent controlling decision of the Supreme Court, and this court is bound to follow it. *Kinder,* 43 S.W.3d at 374. Although not citing *Matthews,* the Eastern District of this court, in *Barnes,* also applied a more restrictive definition when it held that a covenant restricting use to "private residence purposes" meant "that the use or occupancy of the lots in question be *only* for residential purposes, and this would be clearly to the exclusion of *all* other purposes," including Anchor Temple Association's parking lot. 369 S.W.2d at 898 (second emphasis added).

This court finds that the restriction providing that "[n]one of said lots may be improved, used or occupied for other than private residence purposes" is unambiguous. The plain and ordinary language of this restrictive covenant limits the use of the property to private residence purposes only, which are uses that are *"only* for residential purposes, ... to the exclusion of all other purposes." *Id.* Because the proposed use of the parking lot is not for a "private residence purpose," the building of parking lots would violate the restrictive covenant. The trial court did not err in permanently enjoining the Church from constructing parking lots on its property encumbered by the restrictive covenant. Point denied.

### Church Failed to Prove Changed Circumstances

In its second point, the Church claims that even if this court finds that the Church parking lots would violate the re-

strictive covenant, the trial court still erred in enjoining it from building parking lots because changed circumstances preclude the enforcement of the restrictive covenant.

■■■ To establish changed conditions warranting not enforcing a restrictive covenant, "the burden rests on the defendant to prove: (1) The radical change in condition; (2) that as a result enforcement of the restrictions will work undue hardship on him; (3) and will be of no substantial benefit to the plaintiff." *Rombauer v. Compton Heights Christian Church,* 328 Mo. 1, 40 S.W.2d 545, 554 (1931). "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement." *Id.* at 553.

■■■ To meet its burden, the Church first argues that there has been a radical change in conditions since 1917, when the original restrictions were filed. The Church then details the changes in the Church, the area surrounding the Church, and in Kansas City that it claims precludes the enforcement of the restrictive covenant against the building of the parking lots. The changes in Kansas City include the introduction of zoning regulations, which often authorize or require churches to provide off-street parking, and the residential growth patterns in the area. The changes to the area surrounding the Church consist of the transformation of Ward Parkway, the street that runs in front of the Church, "from a residential dirt road into a major six-lane metropolitan thoroughfare for north-south traffic." The changes to the Church itself include the increase in the driving habits, population, and demographic patterns of the Church's members and

the volume of activity at the Church every day of the week.

Second, the Church asserts that the enforcement of the restriction will work undue hardship on the Church because the lack of parking could possibly result in the failure and closing of the Church. Third, the Church contends that the enforcement of the restriction will be of no substantial benefit to the Association, because it presented evidence from a real estate appraiser that the parking lot will not have a negative impact on the values of adjacent homes. Additionally, it claims that the parking lot will actually benefit the neighborhood because it will alleviate hazardous and annoying traffic patterns and will be constructed in such a manner as to enhance the Church and the neighborhood.

■■■ Despite this evidence, the Church fails to meet its burden of proof. While the Church has shown an increase in the use of cars by its members and in the amount of traffic on Ward Parkway from 1917 to today, which has caused a significant parking problem for it, these changes have occurred mainly in the area *surrounding* Hampstead Gardens, the area encumbered by the restrictive covenants. "If no radical change in the condition and use of the restricted property occurs, the circumstances that there have been changes in the territory surrounding the covenanted area will not of itself be sufficient to destroy the restrictions." *Id.* at 553. Thus, the evidence of these changes alone is insufficient to prove a "radical change of circumstances" such that the residential use restriction should no longer be enforced.

The Church has also not shown that Hampstead Gardens has radically changed so that the residential use restriction is valueless to them. To prove "sufficient change of conditions to render the restrictive covenant unenforceable," the general

rule is that "the change must be so radical as to defeat the essential purpose of the covenant or render the covenant valueless to the parties." *Dierberg v. Wills*, 700 S.W.2d 461, 467 (Mo.App.1985). Here, the evidence indicates that Hampstead Gardens is virtually the same as it was in 1917, an area entirely consisting of residential homes except for the Church. Thus, the residential use restriction remains of value to Hampstead Gardens and the Association. *See Proetz v. Cent. Dist. of Christian & Missionary Alliance*, 191 S.W.2d 273, 277 (Mo.App.1945) (holding that when a restricted area "still retains its essential character as a residential area," the residential "restriction remains of substantial value."). The trial court did not err in enforcing the restrictive covenant and enjoining the Church from building parking lots. Point denied.

The judgment of the trial court is affirmed.

All concur.